**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael L. Taylor; Dilawar Khan; Volena Glover-Hale; Manuel Montoya, on behalf of themselves and other persons similarly situated, | CV 10-08125-PCT-FJM |
| Plaintiffs, | **ORDER** |
| vs. | |
| AutoZone Inc., a Tennessee corporation; AutoZone Inc., a Nevada corporation; AutoZoners LLC, | |
| Defendants. | |

The court has before it defendants' motion for summary judgment (doc. 219) and separate statement of facts ("DSOF") (doc. 220), plaintiffs' response (doc. 260) and separate statement of disputed facts ("PSOF") (doc. 265), and defendants' reply (doc. 272).

**I. Background**

Defendants (collectively referred to as "Autozone") operate retail automotive parts and accessories stores.  Plaintiffs are or were employed at Autozone as Store Managers. They allege that they are entitled to overtime compensation under the Fair Labor Standards Act ("FLSA").  On May 24, 2011, we conditionally certified this case as an FLSA collective action (doc. 67).  We defined the class as any person who worked at Autozone as a Store Manager, anywhere in the United States except California, between May 24, 2008 and May

24, 2011.[1]  No motion to decertify the class has been filed.

## A. Autozone's Retail Store Structure

Autozone stores maintain a uniform appearance nationwide.  The company determines, for example, product selection, marketing, pricing, promotions, and internal store design.  Store layout is determined by the "plan-o-gram."  Legal compliance posters are arranged the same way in every store.  Employee appearance is governed by a detailed dress code.  Decisions regarding Autozone policy and processes are made at the corporate level.

Autozone divides its retail operations into divisions, which are further divided into regions, and finally districts.  Exclusive of California, Autozone has over 350 districts.  Each district has between eight and twelve retail stores.  Retail operations in each district are headed by a District Manager ("DM").  Each Autozone store employs a Store Manager ("SM") and an average of seven to ten employees, including Assistant Store Managers ("ASM"), Parts Sales Managers ("PSM"), Commercial Sales Managers ("CSM"), and non-management full and part-time employees.  The SM is the only exempt, salaried employee stationed at a store.

The DMs are not physically stationed in the retail stores.  Each DM makes on-site visits to the stores in his assigned district.  Plaintiffs report that the frequency of these visits varies widely, ranging between a couple of times a year (PSOF ex. 34, Lemke Decl. ¶ 7; PSOF ex. 43 Robbins Decl. ¶ 7; PSOF ex. 45, Sanders Decl. ¶ 7), a couple of times a month (PSOF ex. 31, Jenkins Decl. ¶ 7; PSOF ex. 33, Lager Decl. ¶ 7), once a week (PSOF ex. 32, Kolar Decl. ¶ 7), to multiple times a week (PSOF ex. 44, Rosales Decl. ¶ 4).  When they are not conducting a store visit, DMs communicate with SMs via email, phone, or text.

## B. Store Manager Duties and Compensation

The Autozone SM job duties include:

a. Supervising and scheduling of store personnel;

---

[1]In June 2011 we amended our conditional class certification order to change the operative dates of employment (doc. 87).

b. Assisting customers in finding parts and products using the electronic or paper catalogs;

c. Addressing employee and customer concerns;

d. Operating cash registers and following established cash handling procedures; including but not limited to deposits, petty cash, and Lane Accountability;

e. Completing and delegating store merchandising tasks; including but not limited to stocking the store;

f. Processing returns and managing inventory;

g. Recruiting and hiring personnel;

h. Conduct and review all opening and closing procedures, report discrepancies to District Manager and Loss Prevention;

i. Compliance with established policies, procedures and legal requirements;

j. Strong desire and capability in managing weekly and monthly P&L responsibilities;

k. Motivating their staff to provide WOW! Customer Service;

l. Loss Prevention;

m. Maintain sales productivity, store appearance and merchandising standards; and

n. Managing the commercial department within the store and assisting with day-to-day operational tasks; including but not limited to deliveries, sales calls, and addressing customer concerns.

DSOF ¶ 16.

Employee scheduling begins at the corporate level. Each Autozone store labor budget is modeled by projecting sales on an hour-by-hour basis. The model determines the number of staff hours needed in a store at a given time. Based on the labor budget, a store schedule is computer-generated. SMs modify the schedule if needed by making adjustments based, for example, if a particular employee is unavailable that day. All store schedules are approved by the DM. If stores are not meeting projected sales on a given day, then a DM may tell the SM to cut labor by sending an employee home.

Autozone maintains policies regarding attendance, job performance, and employee complaints. SMs are responsible for monitoring the attendance of their employees. In some

cases, SMs are required to complete Corrective Action Reviews in response to an employee violation of policy. Significant employee issues and complaints must be handled by the DM or HR. SMs do not have authority to fire employees without DM approval. SMs evaluate their employees by completing performance appraisals for each employee twice a year. The SM is the only person in the store with authority to complete these appraisals. They provide comments and ratings, which correspond to recommended pay increases. These are then sent to the DM to be reviewed and finalized. SMs recommend employees for promotion. DMs retain ultimate authority to promote employees and to decide pay raises.

All Autozone store employees, including the SM, are expected to provide outstanding customer service, referred to as "WOW! customer service." Corporate policies detail how customer complaints should be dealt with, including when an SM needs to get the DM involved. Each store lists the DM phone number, and customers can contact the DM directly with complaints.

An automated Store Management System assigns a list of daily tasks to be completed by each store. SMs are responsible for ensuring that assigned tasks are completed by other employees, and are expected to provide on-the-job counseling and coaching on store-related issues. If store employees fail to complete their daily tasks by the end of their shift, SMs stay and complete outstanding tasks.

SMs are responsible for managing inventory. Once a week, Autozone requires SMs to perform an inventory matrix, which requires them to scan the product tag of certain products to confirm that the correct number of items are available in the store and check for discrepancies. They are also responsible for ensuring that returns are processed and merchandise is unloaded from delivery trucks and placed on the shelves quickly according to defendant's precise specifications in the plan-o-gram.

SMs are trained with respect to interviewing and hiring. SMs are the only employees in their stores provided this training. Autozone expects SMs to identify the need for new personnel and to recruit new applicants. After Autozone's automated system conducts an initial screening of an applicant, SMs conduct interviews at the store. They follow

Autozone's interview protocol and complete a standardized interview feedback form.  This form is submitted to the DM, who makes the ultimate decision on hiring.  Once a new "Autozoner" is hired, he completes training modules through Autozone's computer-based "Learning Garage."  It is the SM's responsibility to ensure that each of her employees completes the required training modules.

Autozone generates sales and inventory records ("P&L reports") which are given to SMs for review.  These reports provide information regarding each store's sales and profits.  Each week, the SM receives a "Key Performance Indicator" report.  The SMs are responsible for loss prevention and controlling "shrink" due to theft, damage, or the improper handling of cash.  SMs communicate with corporate management regarding sales, and may propose possible solutions to improve sales performance.  Autozone evaluates SMs on their stores' sales and profit numbers, their maintenance of staffing levels and adherence to the labor budget, their ability to ensure that all employees have completed company training modules, their success of inventory management via the weekly inventory matrix, and shrink and loss prevention skills.

SMs earn between $800 and $1,000 per week, regardless of the number of hours worked.  Each SM is eligible for incentive compensation under the Autozone bonus plan.  The bonus amount is primarily based on the financial performance of the SM's store.[2]  Except for the CSM in stores handling commercial accounts, no retail store employee other than the SM is eligible for a bonus.  Autozone expects SMs to work fifty hours a week.  Plaintiffs state that on average they work sixty hours a week.  PSOF ¶¶ 49(b), 55(c).

## II. Autozone's Restriction of the Motion to Three Named Plaintiffs

Autozone moves for summary judgment against three of the named plaintiffs (Khan, Glover-Hale, and Montoya).  Plaintiffs' response addresses the entire opt-in class and includes testimony and declarations from other SMs.  Autozone asks us to disregard

---

[2] Between 2008 and 2011, bonuses for named plaintiffs Glover-Hale, Khan and Montoya ranged between  $1,364.89 and $6,852.10.

plaintiffs' evidence concerning other SMs, arguing that plaintiffs' evidence is irrelevant because Autozone's motion does not address the claims of all opt-in members. Autozone complains that plaintiffs are attempting to "convert" its motion to address the claims of "more than 1400 potential opt-ins." Reply at 3. In support of its attempt to restrict its motion to three of the named plaintiffs, Autozone cites Hogan v. Allstate Ins. Co., 361 F.3d 621 (11th Cir. 2004). In Hogan, the district court directed the parties to choose three test plaintiffs from an opt-in class of over 2,300 for discovery and for summary judgment motions. Id. at 623. Autozone argues that we may entertain a summary judgment practice as to individual plaintiffs where, as here, the action has been conditionally certified but no final ruling has been made as to whether the case will be tried as a collective action.

Autozone's strategy of filing a summary judgment motion as to three individual plaintiffs in this action is curious. Unlike in Hogan, we have not expressly directed, or indeed even discussed, the use of test plaintiffs in this action. The Rule 16 scheduling order we set in October, 2010 (doc. 22) cautioned that parties represented by the same lawyer "shall file no more than one motion for summary judgment unless leave of Court is obtained." Scheduling Order at 3-4. Autozone has not sought leave to file any additional motions for summary judgment. Even if Autozone requested leave, at this point we would deny it. This action is set for trial on March 20, 2012, and dispositive motions were due on September 30, 2011.[3] Thus, even if we granted Autozone's motion for summary judgment against three of the four named plaintiffs, the claims of close to 1,400 conditional class members would remain.

Hogan held that the district court's entry of summary judgment against not only the test plaintiffs, but against all opt-in plaintiffs, violated Rule 56, Fed. R. Civ. P.'s notice requirement. Hogan, 361 F.3d at 628. This was because the district court had not explicitly notified all plaintiffs that if the test plaintiffs lost on summary judgment, the remaining opt-in

---

[3] Autozone filed the instant motion for summary judgment on September 30, 2011, the deadline for filing.

plaintiffs would also lose.  Id.  We do not face a similar notice problem here.  We did not authorize a test plaintiff procedure in this case.  And plaintiffs opposed Autozone's motion as if the motion addressed the claims of the entire opt-in class.

Autozone has not challenged the propriety of conditional class certification by moving to decertify the class.  Thus, our decision that this action is an FLSA collective action stands undisturbed.  Accordingly, we construe Autozone's motion for summary judgment as filed against the conditional class in its entirety.

### III. The FLSA Executive Exemption

Summary judgment will be granted if the moving party shows that there is no genuine dispute as to material facts and judgment is warranted as a matter of law.  Fed. R. Civ. P. 56(a).  In an action for overtime wages under the FLSA, "the question of how an employee spends his or her workday is one of fact, while the question of whether his or her activities exclude him or her from the overtime-pay requirement is one of law."  Christopher v. SmithKline Beecham Corp., 635 F.3d 383, 391 (9th Cir. 2011).  Under the FLSA, employees working more than forty hours in a work week must receive overtime pay.  29 U.S.C. § 207(a)(1).  Employees working "in a bona fide executive. . . capacity" are excluded from this requirement.  Id. § 213(a)(1).  In 2004 the Department of Labor updated the regulations interpreting the executive exemption.[4]  The current regulations define an employee working in a bona fide executive capacity as one

(1)  Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;

(2)  Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3)  Who customarily and regularly directs the work of two or more other employees; and

(4)  Who has the authority to hire or fire other employees or whose suggestions

---

[4] Because the conditional class is limited to Autozone SMs who worked between May 2008 and May 2011, we apply the post-2004 regulations.

and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).

It is undisputed that plaintiffs are salaried employees earning between $800 and $1,000 per week. It is also undisputed that as SMs plaintiffs direct on average between seven to ten full- and part-time employees on a regular basis.[5] The parties agree that the SMs do not have authority to hire and fire employees without DM consent. Thus, the issues before us are (1) whether an Autozone SM's primary duty is management and (2) whether an Autozone SM's "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." Id. § 541.100(a)(4). It is Autozone's burden to show that it is entitled to the executive exemption. Baldwin v. Trailer Inns, Inc., 266 F.3d 1104, 1112 (9th Cir. 2001).

## IV. Management as Primary Duty

The FLSA regulations describe management activities as including:

interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

---

[5] Plaintiffs argue in their response that all prongs of the executive exemption test other than the weekly salary component are "subject to fierce factual debate." Response at 4. However, they admit that as SMs they were the most senior person stationed at their store, which employed seven to ten other employees. They also fail to address Autozone's argument that this prong is met. See MSJ at 16. Accordingly, we find that there is no material factual dispute as to whether SMs "customarily and regularly" direct the work of two or more employees. See 29 C.F.R. § 541.100(a)(3).

29 C.F.R. § 541.102.  This list is not exhaustive, and the regulations do not require that an employee perform a certain number of "management" activities before the executive exemption applies.  What is required to qualify for the exemption, however, is that an employee perform exempt (in other words, managerial) work as his "primary duty."  Id. § 541.700(a).  Primary duty means the "principal, main, major or most important duty that the employee performs."  Id.  Our determination of an employee's primary duty "must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  Id.

An employee can still have management as her primary duty even if less than fifty percent of her time is spent performing exempt duties, if the following factors support this classification:

> the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

Id. §§ 541.700(a), 541.700(b); see also Baldwin v. Trailer Inns, Inc., 266 F.3d 1104, 1114 (9th Cir. 2001) ("[w]e do not presume that the executive exemption fails merely because the proportion of time spent on exempt managerial tasks is less than fifty percent, where, as here, managerial duties are packaged in employment with non-managerial tasks").  Autozone does not dispute plaintiffs' claims that they spend less than fifty percent of their time performing exempt work.  Accordingly, Autozone must address the above factors.  Although Autozone has the burden to establish that the SMs' primary duty is management, it must "carry its burden only on the primary-duty element as a whole, not on each individual factor relevant to that inquiry."  Thomas v. Speedway SuperAmerica, LLC, 506 F.3d 496, 505 n.6 (6th Cir. 2007).

## A. Relative Importance of Exempt Duties

Plaintiffs admit that they are required as SMs to perform some exempt duties, but argue that they have "no meaningful role" in doing so.  Response at 7.  They contend that the

1    most important duty of every Autozone store employee, including the SM, is "direct

2    customer service and manual labor." Id. at 6.  Without their customer service and labor,

3    plaintiffs aver that Autozone stores would "cease to function properly." Id.  According to

4    plaintiffs, their exempt duties are less important  because SMs perform work that nonexempt

5    employees do (such as stocking shelves and helping customers), and Autozone requires

6    nonexempt employees to perform some of the same duties as the SM (such as opening and

7    closing the store and checking cash register balances).  Performance of "some managerial

8    tasks" by nonexempt workers does not transform these tasks into nonexempt duties.

9    Baldwin, 266 F.3d at 1115.  See also Murray v. Stuckey's Inc., 939 F.2d 614, 618 (8th Cir.

10   1991) (irrelevant to question of primary duty whether "other employees. . . were capable of

11   performing part or even all of the manager's duties").  Similarly, that SMs performed even

12   a substantial amount of manual labor does not end the analysis, because assessing the SMs'

13   primary duty requires us to place a "major emphasis on the character of the [] job as a

14   whole." 29 C.F.R. § 541.700(a).

15        It is undisputed that SMs are the only employees within their store who complete

16   performance appraisals and recruit and interview candidates for open positions.  The SMs

17   are the ones responsible for ensuring that their employees complete the required computer

18   training modules.  SMs are also responsible for ensuring that all daily tasks assigned by the

19   Autozone System are completed.  While SMs argue that it is their manual labor that keeps

20   their stores running (and that it is Autozone policy to resist paying overtime wages by forcing

21   SMs to work long hours to complete unfinished tasks), if they did not perform their assigned

22   managerial tasks, candidates would not be interviewed, employees may skip out on training,

23   daily tasks might slip through the cracks, and employee performance appraisals would sit

24   untouched. See Baldwin, 266 F.3d at 1115 (plaintiffs' principal value to employer was

25   directing "day-to-day operations" of a recreational vehicle park, despite their performance

26   of "a substantial amount of manual labor").  Moreover, plaintiffs admit that if customer

27   service is not provided, sales will suffer, and plaintiffs admit that Autozone evaluates them

28

1   and awards bonus pay based in part on store profitability.  Thus, even the nonexempt task

2   that plaintiffs complain takes up most of their time - providing WOW! customer service -

3   could be performed "in a manner that could make the store profitable, the goal of [the SM]

4   managerial responsibility."  In re Family Dollar FLSA Litig., 637 F.3d 508, 515 (4th Cir.

5   2011).

6       Autozone argues that the value it places on the SMs' managerial functions is revealed

7   by its SM evaluation criteria.  Plaintiffs urge that the managerial areas appearing on the

8   evaluation forms are "disconnected from the reality of SMs' actual job duties."  Response at

9   9.  They fail to explain why this is relevant, when they do not dispute that Autozone actually

10  evaluates them on these criteria.  If an employee's primary duty is management, it remains

11  so regardless of whether the employee meets employer expectations by successfully

12  performing the assigned duties.  See Fetrow-Fix v. Harrah's Entm't, Inc., 10-CV-00560-RLH-

13  PAL, 2011 WL 5827199 at *6 (D. Nev. Nov. 18, 2011) (looking at an employee's job duties

14  and finding that the employee's primary duty was management, despite there being "no

15  evidence that [plaintiff] actually performed any of these duties").  Plaintiffs also argue that

16  nonexempt hourly employees are evaluated on some of the same criteria as the SMs.  But it

17  is undisputed that, with the exception of stores with CSMs, SMs are the only store employees

18  eligible to receive a bonus.  And it is also undisputed that the SM bonus is directly tied to

19  store profitability.  This supports Autozone's argument that it values SM managerial duties

20  by singling SMs out to receive bonuses that reward them for the success of their stores.  By

21  contrast, without the opportunity for a bonus, pay increases for nonexempt employees are

22  tied to individual performance as assessed by SMs and DMs in the performance appraisals.

23

24       Finally, plaintiffs argue that Autozone's extensive policies and processes render the

25  SMs' nonexempt work more important than their regimented and standardized exempt work.

26  Plaintiffs essentially view themselves as insignificant cogs in a vast corporate machine.  The

27  mere existence of  company-wide standardized processes and policies does not as a matter

28

of law prevent a supervising employee from being classified as an exempt manager.  See Baldwin, 266 F.3d at 1117 (ensuring company policies are followed is "essence of supervisory work") (citing Donovan v. Burger King Corp., 672 F.2d 221, 226 (1st Cir. 1982)).  Plaintiffs' own evidence reveals that Autozone, despite plaintiffs' repeated assertions that SMs are interchangeable with nonexempt employees, relied specifically on SMs to ensure that tasks were completed and corporate directives and policies were followed.  See PSOF ex. 37, Marcano Decl. ¶ 6 ("Every Monday morning I was required to participate in mandatory conference calls. . . I was required to be available for these calls no matter if I was out of the Store or on a day off."); PSOF ex 40, Padilla Decl. ¶ 7 ("My [DM] would come in to [sic] the Store every two weeks and expect that the [SM] be present in the Store, even if it was the [SM]'s day off."); PSOF ex. 26, D. Brown Decl. ¶ 7 ("As a [SM] I was always expected to stay at the Store until everything was done for the day, sometimes long after the hourly employees had gone home. . . [t]oday as an hourly Assistant Store Manager I am required to leave when my shift is over and it is now my [SM]'s job to finish up the work I did not complete or get to during my shift.").  Plaintiffs also submitted evidence showing that if an SM leaves the company, Autozone will require another store employee to "step up" and fill an SM's role until the vacancy is filled.  PSOF ex 67, Bacon Dep. 153:18 - 153:20 ("We have someone step up, a [PSM] steps up and helps out until we can fill the vacancy.").

Thus, despite plaintiffs' attempts to dilute the importance of the SM position, the record and the weight of the case law support the conclusion that the exempt duties of SMs - the only employees in each Autozone store charged with certain tasks essential to the operations of the store, and the only employees directly rewarded based on the store's success - are relatively more important to Autozone than their nonexempt duties.

## B. Amount of Time Spent Performing Exempt Work

Autozone does not dispute plaintiffs' contention that they spend the majority of their

1   time on nonexempt tasks such as providing customer service and stocking shelves.[6]

2   Spending less than fifty percent of the time performing exempt duties is not dispositive to a

3   determination of primary duty. 29 C.F.R. § 541.700(b). <u>Baldwin</u>, 266 F.3d at 1114 (no

4   presumption that executive exemption fails "because the proportion of time spent on exempt

5   managerial tasks is less than fifty percent"); <u>In re Family Dollar</u>, 637 F.3d at 514-15

6   (concluding that a store manager in a nationwide chain was an exempt executive despite her

7   testimony that she performed nonexempt work "99% of the time").

8        FLSA regulations explicitly recognize that [c]oncurrent performance of exempt and

9   nonexempt work does not disqualify an employee from the executive exemption." 29 C.F.R.

10  § 541.106(a). As an example,

11      an assistant manager in a retail establishment may perform work such as
    serving customers, cooking food, stocking shelves and cleaning the

12      establishment, but performance of such nonexempt work does not preclude the
    exemption if the assistant manager's primary duty is management. An assistant

13      manager can supervise employees and serve customers at the same time
    without losing the exemption. An exempt employee can also simultaneously

14      direct the work of other employees and stock shelves.

15  <u>Id.</u> § 541.106(b). Autozone argues that plaintiffs perform their nonexempt work concurrently

16  with their managerial duties. It contends that plaintiffs admit observing employee

17  performance while working nearby, and training even while stocking the shelves. Plaintiffs

18  argue that they cannot possibly supervise employees in the store at the same time as working

19  on a customer's car in the back or giving the full attention required to provide WOW!

20  customer service.[7] But managing while serving customers in a retail establishment is an

21

22

23      [6] There is no clear indication, even among plaintiffs, exactly how much time SMs
spend performing nonexempt work. Plaintiffs allege that they spend "approximately 90%"

24  of the time performing manual labor. <u>Response</u> at 2. Yet, in a survey of class members that
plaintiffs submitted, only 55.25% of respondents reported spending less than 25% of their

25  weekly work time performing managerial activities such as interviewing employees and

26  supervising employee performance. <u>PSOF</u>, Lewin Decl. Ex. 2, question 11.

27      [7] These assertions are made despite almost 78% of plaintiffs' survey respondents
stating that while performing non-exempt tasks (including customer service), they were able

28  to "simultaneously do[] other things." <u>PSOF</u>, Lewin Decl. Ex. 2, question 9b.

1   explicit example provided by the regulations.  Id.  The Department of Labor noted in issuing

2   the final rule of the 2004 regulations that the concurrent duties test "accurately reflects the

3   appropriate test of exempt executive status and is a practical approach that can be realistically

4   applied in the modern workforce, particularly in restaurant and retail settings."  Defining and

5   Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and

6   Computer Employees, 69 Fed. R. 22,122-01, 22,137 (Apr. 23, 2004) (to be codified at 29

7   C.F.R. pt. 541).  Thus, the fact that SMs served customers in a retail setting - a task that

8   requires focus - does not, as a matter of law, mean that this nonexempt duty was not

9   performed concurrently with managerial tasks.

10      Plaintiffs nevertheless argue that concurrent performance of duties is inapplicable,

11  because they are "directed by a supervisor to perform the exempt work," 29 C.F.R. §

12  541.106(a), pointing to Autozone's comprehensive task-scheduling system and their DMs'

13  involvement.  But that regulation describes exempt executives as those who "[g]enerally. .

14  . make the decision regarding when to perform nonexempt duties and remain responsible for

15  the success or failure of business operations under their management while performing the

16  nonexempt work."  Id. (emphasis added).  Here, it is undisputed that SMs are responsible for

17  the profitability of their stores and can receive bonuses based on their store's success.

18  Plaintiffs also admit that the nonexempt task of customer service helps to increase sales in

19  their stores.  The record suggests that plaintiffs were concurrently performing exempt and

20  nonexempt tasks as envisioned by the Department of Labor.

21      Even if plaintiffs did not perform nonexempt tasks concurrently with exempt tasks,

22  however, their assertion that they perform nonexempt tasks more than fifty percent of the

23  time is not dispositive.  The amount of time spent on customer service and manual labor does

24  not preclude summary judgment, as this is just one of several factors we must consider in

25  determining the SMs' primary duty.

### C. Relative Freedom from Direct Supervision

27      We next consider the SMs' relative freedom from direct supervision.  It is undisputed

28  that Autozone retail stores are governed by "meticulously detailed corporate policies."

1   Response at 14.   The plan-o-gram dictates the placement of products within the store.

2   Checklists detail standard procedures for opening and closing the store.   The SMs cannot

3   decide to hold a sale, offer new products, or rearrange their merchandise.   The DMs make

4   visits, ranging in frequency from several times a year to once weekly or more.   And when not

5   in the store, they communicate with SMs through phone, email, text messages, and

6   conference calls.

7        Plaintiffs argue that because of Autozone's detailed policies, SMs rarely exercise

8   discretionary powers.   It is unclear under the current regulations how much this matters.   The

9   pre-2004 regulations listed frequency of exercise of discretionary powers as one factor in

10  determining primary duty.   Relative freedom from supervision was listed as a separate factor.

11  Baldwin, 266 F.3d at 1113 (listing pre-2004 factors to determine primary duty).   Under the

12  new regulations, discretion is not mentioned at all in the definition of primary duty.   See 29

13  C.F.R. § 541.700.   This may simply be because the exercise of discretion is one aspect of

14  relative freedom from supervision.   In any case, there is abundant case law (even in cases

15  applying pre-2004 regulations) stating that a manager's required adherence to detailed

16  company policies and lack of unilateral authority to make decisions does not automatically

17  exclude a position from the executive exemption.   See, e.g., Thomas, 506 F.3d at 506-07 (day

18  to day discretion of manager not eliminated by active district manager supervision and

19  standardized company procedures as a matter of law); Murray, 939 F.2d at 619 (standardized

20  procedures and active supervision of district manager did not entirely eliminate manager

21  discretion); Burger King, 672 F.2d at 226-27 (citing with approval decision that drug store

22  manager had primary duty as management despite being unable to make "any significant or

23  substantial decisions," including "setting prices and wages").   Thus, that the SMs lack

24  discretion due to nationwide corporate policies, to the extent that this is relevant under the

25  current regulations, does not mean that their primary duty is something other than

26  management.

27       Next, plaintiffs contend that the SMs are not relatively free from direct supervision

28  due to the frequent visits from and "constant communication" with their DM.   Response at

14. Although the DMs are not physically present in the stores at all times, plaintiffs argue that the constant communication from DMs effectively "project[s] their presence into stores on a daily basis." Id. Autozone contends that SMs, who are the most senior employees stationed at their stores, are relatively free from direct supervision as the DMs cover eight to twelve stores each. It is unclear how often SMs are contacted by the DM, and over the exact purpose of this communication. Plaintiffs state that DMs supplement the store management system daily task assignments with "additional instructions concerning task prioritization, sales objectives and techniques, daily operations, and general store administration." PSOF 6(d).[8] DMs also monitor sales and instruct the SMs to send staff home if sales were slow. Autozone offers evidence that DM calls relate to inquiries about sales. DSOF, Badoux Decl. Ex. A, Montoya Dep. 55:8-55:9 ("Here is an example. You guys are at $400. What are you doing to increase your sales?"). Some of plaintiffs' own evidence suggests that the frequency of DM communications is tied to a particular store's performance. See PSOF, ex. 67, Bacon Dep. 50:10-50:13 ("[S]ome store managers, I wouldn't have to contact that much, but the ones that had more issues than others, I would be in contact with them more often."). Although the exact frequency of calls is in dispute, it appears that the DMs were often in contact with the SMs daily.

Close supervision by a district manager, including frequent calls, does not necessarily equate to a finding that this factor weighs in favor of plaintiffs. See Thomas, 506 F.3d at 507-08 (store manager relatively free from direct supervision, despite frequent monitoring by district manager); Thomas v. Jones Rests., Inc., 64 F. Supp. 2d 1205, 1214 (M.D. Ala. 1999) (restaurant manager relatively free from supervision despite superior calling ten to fifteen times a day, because plaintiff was responsible for restaurant's operation in superior's absence and was answerable for restaurant's performance). Here, we are presented with a

---

[8] Plaintiffs also claim that DMs monitor operations in "real time" and immediately intervene if corrective action is needed. PSOF ¶ 6(e). This is unsupported by plaintiffs' corresponding citation to the record, which states that the DMs can log onto a system and ascertain a particular store's total sales as of that moment, not individual transactions.

situation where plaintiffs were unquestionably the most senior employees at their store, and were present in their stores by their own calculations for hundreds of hours a month without the physical presence of a DM.  Indeed, plaintiffs concede that because DMs cannot be present in all stores, they rely on SMs to be the eyes and ears of the DM.  And plaintiffs' own evidence indicates that frequency of DM communication is influenced by store performance.  Thus, even viewing the disputed facts in the light most favorable to the plaintiffs, we conclude that plaintiffs, despite frequent electronic and telephonic contact with DMs, are nevertheless relatively free from day-to-day direct supervision.

### D. Relationship Between SM Salary and Wages Paid to Others

It is undisputed that SMs earn between $800 and $1,000 weekly and (with the exception of stores with CSMs) are the only employees in their stores eligible to receive a bonus.  By contrast, the ASMs and PSMs are paid hourly.  According to Autozone, the average hourly wage for ASMs and PSMs at Glover-Hale, Khan, and Montoya's stores ranges from $12.00 to $15.00.  DSOF ¶ 49.  Autozone compared Glover-Hale, Khan, and Montoya's bi-weekly salary earnings to the average bi-weekly amount earned by the highest paid PSM/ASM at their respective stores.  For example, in 2009 Khan earned $2,060.60 every two weeks, while the highest paid PSM/ASM earned an average of $1,311.85.  DSOF ¶ 49(b).  In 2010 Montoya earned a bi-weekly salary of $2,089.90, while his highest paid PSM/ASM earned an average of $1,715.44 every two weeks.  DSOF ¶ 49(c).  Plaintiffs do not dispute the amounts cited concerning these particular plaintiffs, but state that the average nationwide hourly wage for PSMs and ASMs ranges between $10.74 and $17.64.  PSOF ¶ 49(d).  Plaintiffs do not, however, provide evidence of the average numbers of hours worked by PSMs and ASMs nationwide or their average bi-weekly pay.

Plaintiffs argue that SMs earn essentially the same as nonexempt workers.  They urge us to compare SM salaried pay to hourly pay by dividing the SMs' weekly salary by sixty hours a week (the hours that plaintiffs claim they work on average).  Doing so sets the hourly rate for SMs at $13.33 to $16.67, which plaintiffs point out is either the same as or less than

the wage paid to nonexempt PSMs and ASMs.  This is not the approach the Ninth Circuit took in <u>Baldwin</u>.  <u>Baldwin</u> simply compared the plaintiffs' monthly salary earned as managers to their assistant managers' monthly salary. <u>Baldwin</u>, 266 F.3d at 1115.  The court did so despite knowing the number of hours that each plaintiff and each assistant manager worked, and knowing that plaintiffs worked more hours than their assistant managers.  <u>Id.</u> at 1110; <u>see also</u> <u>Moore v. Tractor Supply Co.</u>, 352 F. Supp. 2d 1268, 1279 (S.D. Fla. 2004) (noting that the Fourth Circuit does not perform "mathematical gymnastics," but "simply compare[s] the manager's weekly salary with the highest possible non-exempt weekly wage" to determine the pay differential).

Autozone has presented evidence showing that SMs Khan, Glover-Hale, and Montoya made hundreds of dollars more on a bi-weekly basis than their highest paid PSMs and ASMs. <u>DSOF</u> ¶ 49.  Although plaintiffs dispute the average nationwide <u>hourly</u> wage paid to PSMs and ASMs, <u>PSOF</u> ¶ 49, they offer no evidence to suggest that the <u>bi-weekly</u> wage gap between SMs and PSMs/ASMs is any narrower than Autozone presents.  Indeed, taking the highest hourly wage for ASMs/PSMs proposed by plaintiffs, $17.64, and assuming a forty hour workweek, this would place the weekly pay of the highest paid PSM/ASM nationwide at $705.60 (for a bi-weekly amount of $1,411.20).  In contrast, the lowest-paid SMs receive $800 (for a bi-weekly amount of $1,600.00).  In addition, while plaintiffs urge us to ignore SM bonus pay, it is undisputed that SMs were eligible for and received regular bonuses that ASMs and PSMs were ineligible to receive. <u>See</u> <u>Baldwin</u>, 266 F.3d at 1115-16 (considering plaintiffs' bonuses separately from their base pay).  Between the class certification period of 2008 and 2011, these bonuses added between $1,364.89 and $6,852.10 to Khan, Glover-Hale, and Montoya's salaries, which reveals a further separation between the salary and bonus compensation paid to the SMs and bi-weekly wages paid to nonexempt workers working a forty hour work week.

In sum, the relationship between the SM salary and the wages paid to nonexempt PSMs and ASMs weighs in favor of finding that the primary duty of SMs is management.

**E. Primary Duty Determination**

In assessing primary duty we look at all the relevant facts, but place the "major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). Here, although some disputes remain over exactly how much time the SMs spend performing nonexempt tasks and how frequently they are in contact with their DMs, these disputes do not affect our ability to determine as a matter of law whether the SMs have management as their primary duty. See Christopher, 635 F.3d at 391.

The SMs are the most senior employee stationed in each Autozone retail store. They contribute to the hiring of their employees, are responsible for ensuring all daily tasks in the store were completed pursuant to Autozone policy (even if this means performing the tasks themselves), are evaluated on their store's success and their managerial tasks, and are exclusively eligible for bonuses based on store performance. Despite the SMs' frequent contact with their DMs, their lack of authority to deviate from corporate policy, and the significant time they spend performing nonexempt tasks, the overall character of the SM position is that of manager, not simply a retail salesperson. Autozone has met its burden of showing that the primary duty of the SM position is management.[9]

**V. Employment Recommendations Afforded "Particular Weight"**

It is undisputed that SMs lack authority to hire or fire people without Autozone approval. Accordingly, Autozone must show that the SMs' "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(4). Plaintiffs argue that they cannot make any decisions to fire employees, and can only alert the DM when they observe behavior that merits termination. Additionally, they argue that their role in

---

[9] Several courts have reached similar conclusions. See Thomas, 506 F.3d at 502-03 (noting that numerous courts have addressed the issue of whether an "individual store manager in a chain retail operation [] had management as her primary duty," observing that "all have held that the plaintiff's primary duty consisted of management").

hiring is limited to a screening function because of Autozone's use of an interview script and evaluation form.  Thus, plaintiffs conclude that they "do not necessarily make hiring recommendations at all, and when they do, they are given no particular weight."  Response at 17.

We note from the outset that this element of the executive exemption test is disjunctive.  Autozone can meet its burden, in other words, by showing that it gives its SMs' suggestions and recommendations for either "hiring, firing, advancement, promotion, or any other change of status" particular weight.  29 C.F.R. § 541.100(a)(4).  To determine whether suggestions are given particular weight, we must consider "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon."  Id. § 541.105.  Suggestions can have particular weight  "even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision."  Id.  The Department of Labor notes that evidence that recommendations are given particular weight

> could include witness testimony that recommendations were made and considered; the exempt employee's job description listing responsibilities in this area; the exempt employee's performance reviews documenting the employee's activities in this area; and other documents regarding promotions, demotions or other change of status that reveal the employee's role in this area.

Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. R. at  22,135.

Part of the SM's job duties are to recruit and hire personnel and to complete performance appraisals for each store employee.   It is also undisputed that only SMs are trained in hiring procedures, that SMs are evaluated on their recruiting and hiring, and that only SMs have the authority to complete performance appraisals.  Nevertheless, plaintiffs argue that they do not make hiring recommendations.  They point to the standard interview form that they complete, which they note has no place for SMs to indicate whether they

strongly recommend or do not recommend hiring a candidate. The interview form, however, requires the interviewing manager to note a minimum of two reasons for either selecting or rejecting a candidate. DSOF, Young Decl., ex. B at AZ001495. Some of the reasons for rejecting the candidate include "[l]acks professionalism" and "[n]ot customer service focused." Id. Plaintiffs are indeed filling in boxes on a form, but these boxes have meaning and require a judgment call about employment suitability to complete. Plaintiffs' own evidence also contradicts their argument that they never make hiring recommendations. For example, one SM acknowledges that "my [DM] required me to interview at least two individuals per week." PSOF ex. 56, Bolding Decl. ¶ 6d. Plaintiffs also acknowledge that they provide input on hiring. See PSOF ex. 29, Deimel Decl. ¶ 8 ("[w]hile I provide input on hiring and firing issues, ultimately the [DM] makes his own decisions); PSOF ex 42, Rios Decl. ¶ 12 (would recommend potential new hires to DM); PSOF ex. 32, Kolar Decl. ¶ 8 (provided input on hiring and firing issues); PSOF ex. 33, Lager Decl. ¶ 8 (same); PSOF ex. 34, Lemke Decl. ¶ 8 (same). Other evidence submitted by plaintiffs shows that they are required to recruit on a regular basis: "AutoZone requires that its [SM]s spend several hours a week recruiting new hires." PSOF ex. 40, Padilla Decl. ¶ 3 n.1. It is also undisputed that SMs are required to complete performance appraisals twice a year for their employees.

Finally, plaintiffs argue that any hiring recommendations they do give are not relied on by Autozone. To support this statement, they point to one SM who stated that in the year he has worked at Autozone, both people hired at his store were hired by the DM without his input. PSOF ¶ 15(d). Defendant, on the other hand, presented evidence that plaintiff Montoya's DM approved hiring of applicants selected by SMs 80% of the time. DSOF ¶ 22. Despite the dispute over the frequency with which SM hiring recommendations are relied on, there is no dispute that plaintiffs recommend their employees for promotion, and that the DMs consider the performance appraisals plaintiffs submit twice a year when deciding pay increases.

Although SMs lack ultimate authority to hire, promote, and issue pay raises, this does

not as a matter of law preclude a finding that this prong of the executive exemption is satisfied.  It is undisputed that plaintiffs were the sole store employees responsible for interviewing and completing performance appraisals.  Plaintiffs' own declarations acknowledge that they provide input as to hiring and firing, although the frequency with which this input is utilized is disputed.  Plaintiffs do not dispute, however, that their performance appraisals are relied upon by DMs in deciding pay raises.  On balance, we find that Autozone has shown that plaintiffs' suggestions and recommendations as to the "hiring, firing, advancement, promotion or any other change of status" of Autozone employees are given particular weight."  29 C.F.R. § 541.100(a)(4).

### VI. Conclusion

It is evident that plaintiffs feel overworked and stifled by Autozone's exacting demands for nationwide uniformity and process.  Lack of creativity and overwork may be an undesirable by-product of working for a national chain in a struggling economy, but this does not entitle plaintiffs to overtime pay if Autozone properly classified the SM position as exempt.  As discussed above, Autozone has established that the SM position meets each element of the FLSA executive exemption.  See 29 C.F.R. § 541.100(a).  Accordingly, Autozone is entitled to judgment as a matter of law.

**IT IS ORDERED GRANTING** defendants' motion for summary judgment (doc. 219).  The Clerk shall enter judgment.

DATED this 26th day of January, 2012.

_Frederick J. Martone_
Frederick J. Martone
United States District Judge